**FENNEMORE CRAIG, P.C.**
Leslie Bryan Hart (Nv. Bar No. 4932)
7800 Rancharrah Parkway
Reno, Nevada 89511
Telephone: (775) 788-2200
Email: lhart@fennemorelaw.com

Anthony W. Austin (Nv. Bar No. 10850)
2394 E. Camelback Road
Suite 600
Phoenix, Arizona 85016
Telephone: (602) 916-5000
Email: aaustin@fennemorelaw.com

Attorneys for Plaintiff Alliance Trust Company

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re | Chapter: 7 |
| GREGORY E CRAWFORD & TORREY CRAWFORD, | No. BK-25-50104-HLB |
| Debtors. | |
| ALLIANCE TRUST COMPANY, LLC, a Nevada limited liability company, | Adv. Proc. _____ |
| Plaintiff, | |
| v. | |
| GREGORY E. CRAWFORD & TORREY CRAWFORD, husband and wife, Nevada residents | |

**COMPLAINT TO DETERMINE DEBT NONDISCHARGEABLE**

Alliance Trust Company, LLC ("Alliance") asserts that debts owed by Gregory Crawford ("Crawford") and Torrey Crawford[1] (with Crawford, "Debtors" or "Defendants") are non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) and (6). Accordingly, for its complaint, Alliance asserts and alleges as follows:

---

[1] Ms. Crawford is named here to bind the marital community and give notice as required under the Bankruptcy Rules of Procedure.

## INTRODUCTION

1. Alliance seeks a determination that portions of the prepetition judgment entered against the Debtors in case no. CV20-00893, in the Second Judicial District Court of the State of Nevada in and for the County of Washoe (the "Prepetition Litigation") are non-dischargeable.

2. The Prepetition Litigation involved claims by Alliance, among others, against Crawford from which judgment was entered against Crawford in favor of Alliance.

3. The claims in the Prepetition Litigation were arbitrated before former Nevada Supreme Court Justice, the Hon. Nancy Becker (Ret.).

4. The parties litigated these claims to a final conclusion in the arbitration.

5. Ultimately, a decision on the merits and detailed findings of facts and conclusions of law comprising 130 pages were entered by Justice Becker in favor of Alliance and other parties on November 8, 2023 ("the Award").

6. After extensive briefing and oral argument, the Award was confirmed by the Hon. Lynne Jones of the Second Judicial District Court in and for the County of Washoe, State of Nevada, on November 13, 2024.

7. Judgment was entered on December 12, 2024, in favor of Alliance and against Crawford in the Prepetition Litigation as follows:[2]

A.     Compensatory damages in the amount of $1,636,000.74, which reflects an offset of $817,415.00 against compensatory damages awarded of $2,453,415.74;

B.     Punitive damages in the amount of $3,254,168.00;

C.     Attorneys' fees of $1,900,000.00;

D.     Costs of $345,276.21; and

E.     Pre-award interest of $889,298.50.

8. Crawford was found to have willfully and maliciously misappropriated Alliance's trade secrets.

---

[2]     Judgments were also entered in favor of Louis Robinson and against Crawford in the amount of $517,701.40 and in favor of Denis Damiens and against Crawford in the amount of $362,028.96.  These judgments are not the subject of this Complaint.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

51493473.3

9.     Additionally, Crawford was found to have breached his fiduciary duties owed to Alliance and found liable for conversion.

10.     In addition to substantial compensatory damages, punitive damages were entered against Crawford as a result of his willful and malicious conduct.

11.     Crawford is barred by collateral estoppel and res judicata from disputing the facts and conclusions of law entered in the Prepetition Litigation.

12.     The facts and conclusions of law of Justice Becker are in large part set forth in this Complaint as factual allegations.

## VENUE AND JURISDICTION

13.     On February 7, 2025, Debtors filed a voluntary bankruptcy pursuant to Chapter 7 of Title 11 of the United States Code.

14.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 523.  This proceeding arises in and is related to the proceeding commenced by the Debtors, under chapter 7 of Title 11 of the United States Code.

15.     This is a "core" proceeding as defined in 28 U.S.C. § 157(a), (b)(2)(A), and (b)(2)(I).

16.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 & 1409.

## ALLEGATIONS COMMON AS TO ALL CLAIMS

**I.     Relevant Provisions of the Operating Agreement**

17.     On or about January 1, 2015, the members of Alliance executed the Third Amended and Restated Operating Agreement of Alliance Trust Company (the "Operating Agreement").

18.     Alliance's Operating Agreement contains the following, relevant provisions:

a.     Section 3.2 provides that any checks, drafts, or money orders in the name of Alliance that are not in the "normal course of business" and that exceed $25,000 "must be approved by all managers."

b.     Sections 4.7, 4.8, and 4.9 govern the transfer and purchase of a member's membership interest under certain circumstances.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 3 -

c.     Section 4.13 governs the rights of members who have resigned without the consent of the remaining members and the rights of the recipient of the membership interest. Section 4.14 provides the method for admission of transferee members.

d.     Section 4.19 states: "A Member does not have the right or power to withdraw from [Alliance] as a Member without the unanimous written consent of the other Members."

e.     Section 4.20 provides that "[t]he Members may engage in or possess an interest in other business ventures of every kind and description, other than any business which is competitive with the Company's business."

f.     Section 4.21.1 prevents members while they are members of Alliance and for a two-year period following the transfer of their interest in Alliance from (a) operating a trust company authorized to provide services in Washoe County, Carson City, or Douglas County and (b) soliciting current and prospective clients of Alliance.

g.     Section 4.21.2 provides that a violation of Section 4.21 will constitute irreparable damage to Alliance.

h.     Section 4.22.1(b) of Alliance's Operating Agreement provides that each member of Alliance will "hold the Confidential Information in the strictest confidence for the sole benefit of [Alliance], and shall not, without the written consent of [Alliance] use, disclose or permit any other Person to use or disclose, directly or indirectly, of it in any manner whatsoever to any Person any Confidential Information."

i.     Section 4.22.1(a) defines "Confidential Information" to include, among other information, customer information or lists, financial information, marketing information or plans, data, business plans, referral source information, trade secrets,

banking information or investments information, and any customer, vendor or supplier information, computer security or electronic codes and that such information   shall be the exclusive and confidential property of Alliance.

j.      Article VI of provides that the managers, in their discretion, may from time to time distribute net cash from operations, subject to certain limitations set forth in the Operating Agreement. Such distributions shall be made pursuant to the terms of the Revenue and Expense Sharing Agreement between the Members dated on or about Jan. 1, 2015 ("R&E Agreement").

k.      Section 7.5 of the Operating Agreement recognized the two economic production groups relating to the allocation of profits and losses – the "Crawford Group" and the "Damiens Group" which are referenced in the R&E Agreement.

l.      Section 9.1 provides that Alliance shall be governed by managers.

m.      Section 9.16 states that "[t]he act of the majority of the Managers shall be the act of the Managers."

n.      Section 9.17 of the Operating Agreement provides for the election of officers, such as a chief executive officer or chief financial officer, to assist in operating Alliance. (*Id*.) Section 9.17(b) states "[a]ny officer may be removed at any time by the managers or by the members holding a majority of the Membership Interest, with or without cause."

o.      Section 12.5 states: "Managers and holders of Membership Interests in the Company have a duty of undivided loyalty to this Company in all matters affecting this Company's interests and are obligated to act in good faith in dealing with the Company and other holders of Membership Interests."

**II.      Formation and Operation of Alliance**

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 5 -

19.     Alliance is a Nevada limited liability company engaged in the business of providing retail trust company services in Nevada and is licensed to do business under NRS Chapter 669. Per statute, Alliance is a company governed by managers, not a board of directors.

20.     At the time the underlying litigation was filed, Alliance had four members: Gregory Crawford, Denis Damiens, Louis Robinson, and Philip Brown. Ownership interest was as follows: 1) Damiens – 50% membership interest; 2) Crawford – 27.55% membership interest; 3) Robinson – 14.43% membership interest; and 4) Brown – 8.02% membership interest.

21.     Although historically Alliance had three co-managers, after the third co-manager left Alliance, he was not replaced. Instead, pursuant to the Operating Agreement, Crawford and Damiens were the co-managers of Alliance. Alliance created a board of directors that also made governance decisions. Legally the "board of directors" could only operate as an advisory body to the managers. This "board" did that for several years.

22.     At some point in 2018, Robinson grew concerned with Crawford's conduct. In the fall of 2019, tensions that had been simmering between certain members of Alliance began to intensify. Robinson, in particular, had concerns about Crawford's acceptance and/or proposal of business that Robinson believed posed an unnecessary risk to Alliance and threatened its existence and trust company license. Robinson was also concerned about Crawford's personal use of Alliance funds for, among other improper purposes, his own personal travel expenses and that of his family and friends.

23.     In October 2019, Robinson met with Damiens for the purpose of discussing his concerns about Crawford. Damiens had his own concerns prior to the meeting, prompting him to consider a possible exit from Alliance. Following that meeting, in January 2020, Damiens traveled to Reno, Nevada, to meet with the members of Alliance to address these and other pressing matters.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 6 -

51493473.3

24.     Among the matters discussed during Damiens' visit to Reno was the addition of a third co-manager of Alliance to comply with Nevada law. Per Damiens' discussions with corporate counsel, this issue needed to be addressed.

**III.    Crawford's Improper Attempt to Terminate Robinson**

25.     Throughout the spring of 2020, tensions continued to escalate.

26.     Robinson confronted Crawford on numerous occasions about his concerns that Crawford was accepting or bringing business that Robinson believed posed an unnecessary risk to Alliance, as well as Crawford's use of Alliance funds for personal travel expenses and other expenses.

27.     Robinson also had conversations about his concerns with Alliance's then corporate counsel, Lance McKenzie, as well as Sam Haugh and Philip Brown, who then serving as Alliance's Chief Compliance Officer.

28.     In the spring of 2020, Damiens provided notice to the members of Alliance of a members' meeting to take place on May 18, 2020, for the purpose of electing a third co-manager of Alliance.

29.     Due to the majority ownership interest held by Damiens and Robinson, at the time that Damiens noticed the members' meeting to take place in May 2020, it was clear to all members of Alliance that Robinson would be elected as the third co-manager.

30.     Crawford and Brown opposed Robinson serving as the third co-manager of Alliance.

31.     The members' meeting noticed by Damiens to take place on May 18th was postponed to allow the members of Alliance some time to attempt to resolve their concerns and the conflict over Robinson's anticipated election. Those efforts failed.

32.     On May 30, 2020, Damiens re-noticed the members' meeting to take place on June 9, 2020, for the purpose of electing a third co-manager.

33.     On June 1, 2020, Crawford signed a letter addressed to Robinson purporting to terminate Robinson and notifying Robinson of Crawford's intention to purchase Robinson's membership interest in Alliance. The letter was not sent to Robinson.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 7 -

34.    During that week, Crawford worked with Adam Hoppe to finalize an Alliance newsletter announcing Robinson's departure from Alliance. Hoppe was a long-time friend of Crawford's who also was an independent contractor paid by Alliance to perform work for Alliance, and later became a manager and member of CTC.

35.    On June 5, 2020, with just one business day remaining before the June 9, 2020, members' meeting, Crawford purported to terminate Robinson through a letter that was emailed by Crawford to Robinson at the close of business.

36.    On that same date, Crawford also emailed to Robinson a second letter in which Crawford and Brown provided notice to Robinson asserting their position that Robinson was mandated under the Operating Agreement to offer his membership interest for purchase to them as the remaining members of the Crawford Group, and they advised that they intended to purchase Robinson's interest.

37.    Crawford undertook these efforts to prevent Robinson from being elected as a third co-manager of Alliance, which was expected to occur at the June 9, 2020, meeting. Crawford was concerned that Robinson's election as a co-manager would result in his losing control and additional oversight of his conduct.

38.    Using the purported termination, Crawford promptly undertook efforts to terminate Robinson's access to Alliance's various electronic systems, including Alliance's email system, and/or instructed others to do so.

39.    Crawford advised Alliance employees that Robinson was not permitted to enter Alliance's Reno office.

40.    On June 9, 2020, the members meeting went forward as noticed with all of the members in attendance, and, as anticipated, Robinson was elected as the third co-manager of Alliance.

41.    Neither Crawford nor Brown wanted Robinson to be elected as a co-manager. Crawford and Brown voted for Les Revzon, notwithstanding that Brown himself had previously expressed concerns about Revzon, who lived in Massachusetts, and who had only visited Alliance's office a handful of times over the course of ten years. Revzon

is the owner of Revzon Consulting Group, LLC, and his company had a contract with Alliance to perform back-office services. Crawford and Brown also objected to the meeting and Robinson's election based on arguments made by Crawford's legal counsel John Collier, Esq. The argument was based on Robinson's alleged, albeit improper, termination.

42.     Revzon was then, and remains, a close ally of Crawford's. He was intimately involved in Crawford's subsequent efforts to misappropriate Alliance's confidential business information and to compete with and solicit Alliance referral sources and clients. He later became a co-manager of Crawford Trust Company, which was secretly founded by Crawford and competes with Alliance in violation of Alliance's Operating Agreement.

43.     On June 10, 2020, Robinson filed suit against Crawford and Brown in the Second Judicial District Court, Washoe County, Nevada, Case No. CV20-00893, which is the Prepetition Litigation, alleging two claims for declaratory relief, as well as claims for breach of contract, and contractual and tortious breach of the covenant of good faith and fair dealing. Robinson also sought and eventually obtained both a temporary restraining order and a preliminary injunction.

44.     On June 24, 2020, Judge Lynne Jones entered a temporary restraining order to preserve the status quo pending a preliminary injunction hearing. Judge Jones required that Crawford and Brown, and those acting in active concert and participation with them, immediately: 1) refrain from taking any actions to terminate Robinson from Alliance; 2) allow him to resume all aspects of his employment, including, but not limited to, restoring his access to Alliance's computer systems; 3) withdraw any notification to any third party of Robinson's purported termination; and 4) refrain from forcing a sale of Robinson's membership interest in Alliance.

45.     On October 6, 2020, Judge Jones entered a preliminary injunction, which terms were virtually identical to those imposed by the temporary restraining order.

46.     On December 22, 2020, Crawford unilaterally, and without prior notice to members of the Crawford Group, and without following well established practices

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 9 -

51493473.3

followed in the past by the members of the Crawford Group, declared a member distribution in the total amount of $700,000.

47.    Crawford caused cashier's checks to be issued in the following amounts: $442,135.40 to himself; $165,860.63 to Robinson; and $92,003.97 to Brown. The payment of a distribution by cashier's check was unprecedented and done to circumvent Alliance's usual protocols and to prevent Robinson and/or Brown from interfering with the improper distribution. The distribution was also inconsistent with the Crawford Group's prior practice of declaring a members' distribution for the sole purpose of offsetting tax implications of so-called phantom income. No other members, including Damiens, consented to the distribution. Crawford never considered obtaining consent from the other managers or members, and a distribution in this manner and in this amount had never been done before.

48.    The timing of Crawford's unauthorized distribution on December 22, 2020, coincided with Crawford's need to provide proof of capital in the amount of $1,000,000 in connection with his application for a trust company license filed with the Nevada Financial Institutions Division ("FID") on December 21, 2020. Further, Crawford contemplated this distribution for some time because on November 13, 2020, he exchanged emails with his attorneys, James Kalicki and John Collier, asking "how we get it [Alliance's money] out?"

49.    Crawford's calculation of the distribution amounts to himself, Robinson, and Brown was erroneous because Crawford improperly relied upon Mike Bosma's analysis prepared in connection with a Court-ordered mediation that took place in September 2020. Bosma, who is a Certified Public Accountant, worked for Belle Business Services, which was hired by Crawford to assist him during the mediation, and then into November and December 2020 when Bosma helped Crawford with the December 2020 distribution. Bosma was designated by Crawford as an expert witness during the subsequent arbitration hearing.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 10 -

51493473.3

50.    Crawford's unauthorized and erroneously calculated distribution deprived Robinson of $36,159.39 that he was entitled to receive of the $700,000 unilaterally distributed by Crawford.

51.    On December 23, 2020, Brown emailed Crawford and demanded that Crawford's unilateral distribution of $700,000 be reversed. Robinson echoed Brown's request. Crawford refused to return his distribution.

52.    On that same day and pursuant to an arbitration provision in the Alliance Operating Agreement, Robinson filed a Statement of Claims with Advanced Resolution Management ("ARM") against Crawford asserting claims for declaratory relief, breach of contract, contractual breach of the covenant of good faith and fair dealing, tortious breach of the covenant of good faith and fair dealing, which Statement of Claims was amended on May 21,2021 to add Damiens as a claimant, and added a claim for breach of fiduciary duty.

53.    On March 8, 2021, Brown suspended Crawford from Alliance pursuant to and for potential violations of Alliance's U.S. Bank Secrecy Act/Anti-Money Laundering Policy, which was unrelated to the ongoing legal dispute between Alliance's members. Alliance did not inform clients or others of the suspension. Individuals were simply told Crawford was unavailable if inquiries were made. Some clients and referral sources contacted Crawford to ask what was going on. Crawford informed them of the suspension.

54.    On May 28, 2021, Crawford, who remained suspended from Alliance, resigned his position as a co-manager and president of Alliance.

55.    Alliance filed with ARM on June 4, 2021, its Statement of Claims against Crawford after it discovered that Crawford was secretly opening a new trust company, later called Crawford Trust Company, to compete with Alliance at the same time he was purportedly running Alliance. Alliance also discovered that Crawford was emailing himself no fewer than 63 separate Alliance documents containing Alliance's confidential business information and trade secrets and had reason to believe that Crawford was violating the non-solicitation and non-compete provisions of the Operating Agreement.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

51493473.3

56.     In its Statement of Claims, Alliance asserted claims against Crawford for breach of the Operating Agreement, contractual breach of the covenant of good faith and fair dealing, tortious breach of the covenant of good faith and fair dealing, breach of fiduciary duty, misappropriation of trade secrets under NRS 600A.101, *et seq*., conversion, copyright violation under 17 U.S.C., civil embezzlement, and interference with prospective economic advantage.  Alliance also sought injunctive relief.

57.     On June 7, 2021, Alliance sought and was thereafter granted a temporary restraining order against Crawford. The June 29, 2021, Order Granting Alliance's Application for Temporary Restraining Order enjoined Crawford and those acting under his direction and control from further use and disclosure of Alliance's confidential business information, enjoined Crawford from soliciting Alliance's current and prospective clients, and enjoined Crawford from competing with Alliance.  Later Alliance was granted a preliminary injunction.

58.     Crawford responded to Robinson's and Damiens' Amended Statement of Claims on June 7, 2021, and responded to Alliance's Statement of Claims on June 16, 2021, by filing a motion to dismiss, which was denied.  Later Crawford filed an answer to Alliance's Statement of Claims, and asserted counterclaims against Alliance, Robinson and Damiens for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment (as to Robinson and Damiens), accounting (as to Alliance), conversion (as to Robinson and Damiens), breach of fiduciary duty (as to Robinson and Damiens) and for dissolution of Alliance and injunctive relief.

59.     On August 12, 2021, Crawford notified Alliance he intended to withdraw as a member of Alliance. As the members did not unanimously accept his voluntary withdrawal, Crawford's legal withdrawal was not effectuated on that date, but Justice Becker later recognized the withdrawal legally speaking in March 2023 when she announced her oral ruling in favor of Alliance, Robinson, and Damiens, which precipitated her later entry of the written Award.

**IV.    Crawford's Conduct Related to Alliance's Claims**

**A.    Crawford's Improper Use of Alliance's Funds**

60.     Beginning in the summer of 2016, Crawford took his family on vacations including to places such as Australia and New Zealand, Hawaii, London, Ireland, Switzerland, and Italy, among other places, at a cost to Alliance of over $34,000. He used his Alliance debit card to pay for these trips. Although a portion of these trips had a business purpose, such as attendance at business meetings or conferences, the trips were primarily personal family trips improperly paid for with Alliance funds.

61.     Crawford knew others, including his wife, Torrey Crawford, used his Alliance debit card to pay for flights for non-Alliance individuals.  Records show flights taken by people other than Crawford's family, such as Lance McKenzie, James Kalicki, and others, were booked by Crawford's wife using Alliance's debit card. The total cost to Alliance by Crawford using Alliance's funds to pay for flights for non-Alliance employees was $9,397.31.

62.     Crawford's previous attorneys, Kalicki Collier, LLP, received $5,000 of Alliance funds in June 2020, which were charged by Crawford through his Alliance debit card. The charge was inaccurately classified as "Meals and Entertainment" on Alliance's books during the time that Robinson had been allegedly "terminated" by Crawford. At that time, Kalicki Collier was representing Crawford individually in the underlying Prepetition Litigation.  The firm was not representing Alliance nor did Alliance approve paying Kalicki Collier LLP as Crawford's personal counsel.

63.     On February 4, 2021, Crawford caused to be issued by Alliance a cashier's check payable to Belle Business for $9,077.57 for work performed for Crawford personally. Further, Bosma and Belle Business were hired by Crawford and Torrey Crawford to complete their personal tax returns and to provide other accountant related services to them in their individual capacities.

**B.    Crawford Improperly Taking Alliance's Documents**

64.     In the late summer or early fall of 2020, Crawford began to undertake efforts to apply to the FID for a trust company license of his own.  Ultimately, on December 21,

2020, Crawford submitted an application to FID for what would become Crawford Trust Company ("CTC"). Crawford did not inform the other Alliance members that he had applied to the FID for a new trust company license.

65.     In connection with his efforts to obtain a license that would enable him to compete with Alliance, beginning at least as early as August 2020, Crawford and others began emailing to themselves Alliance's documents, including Alliance's lists of referral sources, Alliance's policies, its financial information, client lists, and other documents to use to support Crawford's FID application and ultimately for use in his operation of CTC. Referral sources are individuals and entities, typically law firms or attorneys, that refer clients to Alliance. Referral sources are particularly important in the trust business because clients rarely come directly to trust companies like Alliance; instead, they are referred. Alliance compiled various lists of its referral sources to track who was referring business to Alliance. Alliance also compiled various lists of its clients. Crawford misappropriated this information.

66.     On August 27, 2020, Crawford sent to his personal email Alliance's entire profit and loss history.

67.     On October 1, 2020, Crawford sent to his personal email and to Jouko Sipila a large Excel spreadsheet with Alliance's referral sources and client data. Sipila was a long-time personal friend of Crawford who was acting as an independent contractor for Alliance ostensibly doing business development, and who later became a manager and member of CTC.

68.     On October 6, 2020, Sipila emailed Crawford an Alliance Referral Source Report.

69.     On October 11, 2020, Crawford sent to his personal email a copy of Alliance's Referral Source List sent by Sipila, containing a list of all Alliance referral sources, the number of accounts referred, the specific accounts tied to the particular referral source, and the amount of revenue attributable to each referral source.

70.    On October 13, 2020, Crawford emailed Sipila a copy of Alliance's 2019 Review and 2020 Strategic Marketing Plan.

71.    On October 13, 2020, Crawford sent to his personal email Alliance's draft tax return.

72.    On October 14, 2020, Crawford sent to his personal email three Alliance budget spreadsheets and financial statements.

73.    On October 14, 2020, Crawford emailed to his personal email  Alliance's second quarter budget projections.

74.    On October 16, 2020, Crawford sent to his personal email Alliance's highly confidential 2020 Nevada Financial Institutions Division Final Exam. FID Exams cannot be shared with anyone without express pre-approval from the FID and doing so is a violation of NRS Chapter 669.

75.    On October 16, 2020, Crawford sent to his personal email the following Alliance policies: IT Policy Matrix of Changes; De-Risking Policy; Alliance's 2020 BSA/AML Policy; Alliance's Policies and Procedures Matrix of Changes; and Alliance's Policy and Procedures.

76.    On October 19, 2020, Crawford sent to his personal email a spreadsheet titled 2020 Fee Review – Master List Updated. This spreadsheet contained all of Alliance's fees for all Alliance clients, and it discussed fee increases for certain clients.

77.    On October 20, 2020, Crawford sent an email titled "More Docs" to his personal email account, which contained an email from Philip Brown regarding a new trust, Alliance's Billing Procedures, and Alliance's Trust Fees Invoices.

78.    On October 30, 2020, Crawford sent to his personal email Alliance's 2020 Fee Review – Master List, which provides the specific fees charged to each Alliance client.

79.    On November 2, 2020, Sipila sent Crawford an Excel sheet titled "2020 Fee Review – Master List Updated," which contained all of Alliance's referral sources, revenues, and client information.

80.     On November 22, 2020, Crawford sent to his personal email the following Alliance documents:

- Alliance's Business Owner's Policy with one of its insurers;
- Alliance's Crime Protection Policy with one of its insurers;
- Alliance's cyber policy with one of its insurers;
- Alliance's errors and omissions (E&O) policy with one of its insurers;
- Alliance's signature bond guarantee with one of its sureties;
- Alliance's worker's compensation policy with one of its insurers;
- Alliance's internal Vendor Management policy;
- The Privacy Policy notice that Alliance provides to its clients;
- A disclosure form that Alliance provides to clients;
- A PDF containing a suite of Alliance documents that Alliance provides to clients;
- The terms and conditions for Alliance's DDM$^{SM}$ Program for clients;
- Alliance's Trust Account Application for clients;
- Alliance's instructions to Nevada State Bank concerning customer deposits, among other things;
- Alliance's instructions to Nevada State Bank concerning customer funds accounts, among other things;
- Alliance's instructions to Nevada State Bank concerning the Alliance agents permitted to conduct outgoing wire transfers, among other things;
- Alliance's 2019 Internal Audit Report;
- A document entitled "Internal BSA Audit";
- Alliance's 2019 Reconciliation Report;
- A document offering an explanation for Alliance's Nevada State Bank reconciliation;
- A document offering an explanation for Alliance's Reich & Tang account reconciliation;

- Alliance's Schwab Recon and Price Import document for its Charles Schwab account;
- Alliance's BSA/AML Policy (this refers to a policy regarding the Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") policies);
- Alliance's AML Risk Assessment report;
- Alliance's De-Risking Policy;
- Alliance's report on its Disaster Recovery Test;
- Alliance's information technology policy;
- Alliance's Consultancy Agreement with Revzon Consulting Group, LLC;
- Alliance's Services Agreement with Sierra Nevada Wealth Management, LLC; and
- Alliance's Services Agreement with The Planning Group, LLC.

81.   On November 23, 2020, Crawford sent Revzon, a manager of CTC, an email titled "more Policies and Procedures" that included Alliance's BSA/AML Policy; Alliance's Consolidated IT Policy; and Alliance's De-Risking Policy.  In an email to Crawford, Revzon admitted that "we've copied" Alliance's policies.

82.   On February 9, 2021, Crawford emailed Revzon a copy of Alliance's Employment Handbook following a discussion the two had about it.

83.   Also, on February 9, 2021, Crawford sent to his personal email account the following attachments:

- 160320- Employment Handbook.pdf;
- Employment Handbook-(2).doc;
- HR TERMINATION CHECK LIST.docx;
- Auth for Release of Information.docx;
- Employee Offboarding - ATC.pdf;
- Check writing procedures.docx;
- Communicable Diseases Policy.docx;
- HR - Payroll procedures.docx;

- Infectious Disease Control Policy.docx;

- PTO Policy.docx;

- CONFIDENTIALITY AGREEMENT.docx;

- Employee On-Boarding.docx;

- Office Manager Job Description.docx;

- Photo Release Agreement.pdf;

- Reference Questionnaire.docx;

- Conditional Offer letter.docx;

- Employee Review Form - Basic.docx;

- Employee Review Form - Interim.docx;

- Paid time off leave request.docx;

- Trust Administrator II, III & TO I.docx;

- Trust Administrator Job Description;

- Trust Office Job Summary

- Trust Officer Job Posting -The Writ version;

- Trust Officer Job Posting;

- Draft Sr. Trust Officer Posting;

- 2019 Annual Bulletin Minimum Wage;

- EEOC Poster;

- ENG-OSHA POSTER;

- EPPAC Poster;

- Employee Rights Poster; and

- Brief Description of Rights and Benefits.

84.    Excluding the 2019 Annual Bulletin Minimum Wage, EEOC Poster, ENG-OSHA Poster, EPPAC Poster, and Employee Rights Posters, all of which were on Alliance's servers, but were created by the State of Nevada and required to be posted in offices, each of the documents attached to the email were Alliance documents stored on Alliance's servers.

85.     Crawford also sent to his personal email account numerous Salesforce reports that contained information regarding Alliance's clients and Alliance's financial information on the following dates:

- October 2, 2020;
- October 9, 2020;
- October 30, 2020;
- November 20, 2020;
- November 27, 2020;
- December 18, 2020; and
- December 25, 2020.

86.     Crawford also sent to Sipila's personal email a Salesforce report on October 30, 2020, stating that the Salesforce report "might fill in some gaps from the most recent report," which was intended to be used by CTC.

87.     On February 28, 2021, after Crawford submitted the FID application and on Hoppe's last day providing services to Alliance as an independent contractor, Hoppe downloaded a CSV file containing Alliance's entire list of clients, potential clients, referral sources, and other contacts, totaling 34,060 rows of information. He did this while he was with Crawford and Sipila secretly meeting in a Las Vegas hotel room working on CTC matters. The CSV file also contained information on potential clients and referral sources that Alliance interacted with at conferences or online and provided each contact a score, with the higher scores indicating a higher likelihood that the individual would utilize Alliance's services. At the time, Crawford and CTC represented to the FID that they were intending to use Salesforce as their customer relationship management system, just like Alliance.

**C.     Alliance's Efforts to Maintain Secrecy of its Documents**

88.     Alliance does not advertise to the public its referral sources, clients, fees charged to specific clients, BSA/AML Policy, its financial information (budgets, income statements, profit and loss statements, tax returns), or other policies and documents that

Crawford took, nor is any of that information available to the public. Alliance does not disclose to competitors or the public the amount of revenue brought in by specific referral sources or the number of accounts attributable to any particular referral source. Nor does Alliance disclose to competitors or the public a list of all its clients or the amount of fees charged to each of its clients. Instead, these documents and information are kept internally at Alliance or with employees or independent contractors who are conducting work for Alliance and are subject to confidentiality provisions either by contract or by industry norms.

89.    Alliance's client lists, the fees charged to specific clients, referral sources, and financial information are all securely stored electronically. Each program is accessible only to Alliance employees or independent contractors who have been provided individual usernames and passwords to access the programs. Alliance's financial information is maintained on QuickBooks, which Alliance paid for, and which is accessible only to certain Alliance employees who are approved and need access to the program.

90.    It took Alliance approximately five years and substantial effort to develop its client list, referral source list, and other internal documents that were downloaded by Crawford and others on his behalf. This included attendance at conferences, substantial marketing efforts, and maintaining relationships with referral sources. Additionally, Alliance incurred substantial costs to develop and maintain the information stored in the CSV file.

**D.    Crawford's Improper Use of Alliance's Documents to Setup CTC**

91.    Crawford and others, including Sipila, Hoppe, and Revzon, all of whom would later become CTC managers, admitted to using various Alliance documents in setting up CTC. Sipila was provided Alliance's financial information, which included profit and loss statements, revenue figures, revenue figures for each Alliance referral source, prices charged for each Alliance client, income statements, balance sheets, and other Alliance financial information for use in projecting CTC's revenues. Crawford's and Sipila's intention was to utilize Alliance's documents, including the referral sources on

Alliance's referral source lists, to target specific Alliance referral sources that would refer business to CTC. CTC's business plan to the FID touts that "CTC's principals have substantial existing relationships with industry leaders and referral sources (lawyers, corporate partnerships, CPAs, financial advisors, etc.)." In exchange for Hoppe's and Sipila's participation in this unlawful conduct, Crawford awarded them membership interests in CTC at below market prices.

92.     In an email exchange between Crawford and Hoppe in August 2021, Hoppe made clear that it was Hoppe's understanding that the CTC group intended to use Alliance's trade secrets to "break" Alliance and "take the pieces from them we want." Crawford stated that he agreed with Hoppe. Sipila used Alliance's documents to create revenue projections for CTC, which were used in applying to the FID, and used Alliance's client and referral source lists to target them for CTC's benefit. Sipila and Crawford "started looking at some revenue numbers and coming up with, you know, potential clients or referral sources that we think we had the best relationship with, you know, would refer business to us." Sipila confirmed that the information he was reviewing was Alliance's, stating that he was reviewing "Alliance information, so I don't remember if they were sent to me or if I got it from Salesforce...."

93.     After receiving Alliance's documents from Crawford, Sipila (with input from Crawford) created CTC's financial projections which were titled "Alliance – referral sources -through 2019" and referred to Alliance, the total revenue from each referral source, and the revenue per trust from the referral source. Based on the revenue numbers from Alliance's referral sources, CTC then estimated how many trusts each Alliance referral source was likely to refer to CTC and the revenue and fees generated from each referred trust. The purpose of compiling this information was to determine which of Alliance clients CTC could steal and how much revenue each of them would generate for CTC. Further, the CTC financial projections used Alliance's confidential and trade secret information and likely revenue from each targeted Alliance referral source to project CTC's income for five years.

94. The CTC financial projections further listed which of Alliance's referral sources CTC would target once it became operational and the CTC financial projections are based on the likelihood of successfully targeting that referral source. CTC's financial projections list for each Alliance referral source "comments," "GC comments," and "probability." The "comments" column is Sipila's projection on whether the Alliance referral source would refer business to CTC and the "GC comments" are Crawford's projection on each Alliance referral source referring business to CTC. The "probability" column listed Sipila and Crawford's estimate of whether the Alliance referral source would send business to CTC. Further, the CTC financial projection provides a discount of 10% for each account referred to CTC by an Alliance referral source and the assumption that CTC would collect 90% of the revenues collected by Alliance.

95. Regarding Alliance's policies, Crawford sent Revzon Alliance's documents in setting up CTC. Crawford testified during the Preliminary Injunction hearing that Alliance's Policies were, at a minimum, referenced when drafting CTC's Policies. On December 31, 2020, after Crawford sent Revzon Alliance's policies and after Crawford submitted CTC's application to the FID, Revzon emailed Crawford stating, "I don't know where we stand with the ATC [Alliance Trust Company] policies. I know we've copied them but I don't know if all of the changes that need to be made were actually made." Revzon sent a spreadsheet regarding tasks for CTC, and Revzon lists such tasks as developing fee schedules and wrote "send Adam [Hoppe] list of Fees (ATC)." Additionally, Revzon listed developing certain policies for CTC and listed creating an employee handbook and wrote "Greg send to Les [Revzon]."

### E.    Crawford's Improper Use of Alliance's Documents to Operate CTC

96. Alliance's referral source lists and client lists were used before and after the FID issued a non-objection letter on July 22, 2021, which was the final step for CTC to obtain its trust license, to target which Alliance referral sources to go after to refer business to CTC. Crawford and others continued to use Alliance's documents up through and even beyond the entry to of the Preliminary Injunction was issued on November 22, 2021, which

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

51493473.3

was also after CTC became fully licensed by the FID on September 10, 2021, but before CTC became fully operational. Crawford and others were using Alliance's information to determine who to target "before the preliminary injunction, [Sipila] believe[d] there were plans to do that, but after the injunction it was not acted upon." CTC was ready to become operational in a week or so after the FID approved Crawford's FID application but for the Temporary Restraining Order issued in the arbitration.

97.    Crawford was in contact with 13 Alliance referral sources that he had targeted to refer business to CTC after his resignation from Alliance and before the Preliminary Injunction was issued.   Additionally, after sending Sipila Alliance's referral source list, Crawford stated that he is "going to make sure every referral source is a connection on LinkedIn."

98.    While waiting for approval from the FID, Crawford maintained contact with several of Alliance's referral sources.

99.    The Preliminary Injunction was issued on November 22, 2021, and specifically prohibited Crawford from "contacting, soliciting, or communicating with any referral source, person, business, or other entity contained on the Referral Source List until after the arbitration hearing, except as otherwise stated in this Order."

100.    Crawford engaged in communications with Alliance's referral sources that he had targeted beginning in at least June 2021, maintained communication while waiting for approval from the FID and a ruling on Alliance's Preliminary Injunction, and then followed through in communicating with those targeted Alliance referral sources once CTC could operate.

101.    There were at least 15 individuals or entities representing over 100 unique accounts noted on Alliance's referral source list, sent by Crawford to his personal email address, who Crawford subsequently contacted after the Preliminary Injunction was issued to inform them of CTC, which was consistent with and in furtherance of his plan to target those Alliance referral sources.

102.    CTC's current client list showed that at least 55% of CTC's accounts are tied to Alliance's referral sources.

103.    Since November 22, 2021, CTC has received 111 accounts from Alliance referral sources that Crawford contacted in violation of the Operating Agreement and Preliminary Injunction.

**F.    Crawford's Operation of CTC in Violation of the Operating Agreement**

       **1.    *Crawford's Improper Conduct Related to the Non-Solicit Provision***

104.    Following the entry of the Preliminary Injunction on November 22, 2021, 29 Alliance clients removed Alliance as trustee and appointed CTC as the new trustee. Crawford had direct communications with each referral source associated with a client who left Alliance and joined CTC.

105.    Crawford admitted to discussing with an Alliance referral source in November 2021, a client that ceased its relationship with Alliance in late November 2022.

106.    In March 2021, documents for another potential Alliance client were drafted and submitted to Alliance for its review and consent to act as trustee. Alliance approved taking on those trusts; however, the trusts were never signed after Crawford was suspended in March 2021. In April 2021, after Crawford's suspension, the referral source emailed Crawford's personal email regarding these trusts, and he asked Crawford to provide feedback, but "I think we need to proceed with Alliance or your new setup asap."

107.    On November 30, 2021, the same day that Crawford informed this referral source that  CTC was open, the referral source emailed Jason Morris (a Reno attorney and Alliance referral source) to replace Alliance and input CTC's information for the three new trusts, all of which became CTC's clients.

108.    On December 22, 2021, Crawford met with another Alliance referral source. Part of that discussion included having that referral source send his clients, who were using Alliance, a letter to incentivize moving from Alliance to CTC.

109.    The letter was sent to Crawford to review and provide input. Crawford authorized the letter and this referral source referred 50 individual clients to CTC.

110. Crawford communicated with at least one other referral source as well about sending a similar letter to their clients with Alliance.

### 2. *Crawford's Improper Conduct Related to the Non-Compete Provision*

111. CTC was formed on March 5, 2021, with Crawford as the sole owner. The Application to the FID for CTC stated that Crawford intended to operate CTC in Reno. CTC leased office space in Reno. However, Alliance's Operating Agreement expressly states that Crawford cannot provide trust services in Washoe County, Carson City, or Douglas County.

112. Later, around the time of the Preliminary Injunction hearing in the arbitration proceeding, CTC leased an office in Dayton, Nevada. CTC did not formally inform the FID of its move to Dayton until September 14, 2021, which was during the Preliminary Injunction hearing.

113. On March 11, 2021, Gloria Petroni, a Reno based attorney and an Alliance referral source informed Crawford by email, "I am nominating your trust company to act as a Trustee for my client, what is the name of your new trust company?"

114. Crawford was also a member of Entrepreneurs' Organization – Reno ("EO – Reno"), a networking group. On March 24, 2021, Bosma, also a member of EO – Reno, asked Crawford "Where [sic] you able to get a new trust charter?" Crawford responded, "day 94 of a '90 day' approval process...so frustrating. can you send everyone's email to my Hotmail account please? I need to apologize to all."

115. CTC has a total of 69 accounts associated with a Nevada estate planning company with its only Nevada business location in Incline Village, Nevada, which is in Washoe County. Although that company's primary office is in Arizona which is where Hoppe and Crawford went to solicit this business, this does not alleviate the fact that the company operates within the three counties specified in the Operating Agreement.

116. CTC's client list identifies two accounts referred by Lance McKenzie, an attorney located in Reno and an Alliance referral source. Crawford also communicated with Reno attorney Jason Morris about establishing trusts for his clients with CTC.

### G.    The Arbitration Hearing and Decision

117.    After extensive discovery and motion practice over a two plus year period, Justice Becker conducted a two-week arbitration hearing between December 5 and 16, 2022, at which a dozen witnesses testified. At the close of hearing, Justice Becker shared her observations of the proceedings and ordered the parties to submit post hearing briefs.

118.    Following the submission of those briefs, on March 14, 2023, Justice Becker rendered her oral ruling in a videoconference attended by counsel as well as Robinson, Damiens and Crawford.  In that oral ruling she observed that "having now heard him testify on two occasions, Mr. Crawford, I'm sorry to say that I can give your testimony little credibility."  Oral ruling at p. 17.  She further addressed Mr. Crawford to observe "You don't like rules. You think that rules get in the way." And Justice Becker observed that Mr. Crawford "tended to dodge questions" and sought the advice of counsel, not because he wanted "an honest opinion" but because he wanted to find "a way around the provisions." *Id.* at p. 18.

119.    In her verbal ruling, Justice Becker found in favor of Robinson, Damiens and Alliance, and against Crawford.

120.    As to Alliance's misappropriation of trade secrets claim, she concluded that Crawford misappropriated Alliance's trade secrets, and that he did so "willfully" and "deliberately." *Id.* at p. 68. Among other damages, she awarded Alliance punitive damages finding that Crawford's conduct was "deliberate", was "as willful as it gets" and that Crawford "intended to take it so [Crawford] could compete and so that [Crawford] could get Alliance's business and get up and running quickly …." *Id.* at p. 82.

121.    Justice Becker also found that Crawford had committed multiple breaches of fiduciary duty including unilaterally declaring a $700,000 distribution, starting his own competing trust company while still a member of Alliance, soliciting Alliance's clients, using Alliance funds for personal travel, and using company documents for the benefit of his new company. *Id.*  at p. 110. She awarded damages for these violations as well.  Justice

Becker also found Crawford liable for conversion. *Id.* at p. 115. Justice Becker indicated her intention to issue a written Award that would include the precise damages awarded.

122.    On November 8, 2023, Justice Becker entered her written Findings of Fact, Conclusions of Law, and Award in which she awarded Alliance damages on its Claim for Breach of Fiduciary Duty against Crawford in the amount of $1,027,295.73 as follows:

    i.      Crawford's improper use Alliance's funds to purchase JetBlue airline tickets in the amount of $9,397.31;

    ii.     Crawford's improper use of Alliance's funds to pay Belle Business Services in the amount of $9,077.57;

    iii.    Crawford's improper use of Alliance's funds to pay Kalicki Collier LLP in the amount of $5,000;

    iv.    Crawford's improper use of Alliance's funds for his family's vacations in the amount of $22,730.85;

    v.     Alliance's lost profits in the amount of $352,785 (which was also awarded under Alliance's First Claim for Relief);

    vi.    The value of Alliance's documents taken by Crawford in the amount of $233,510, (which was also awarded under Alliance's First Claim for Relief;

    vii.   Damages for Crawford's solicitation in the amount of $338,330.

    viii.  Damages for Crawford's usurpation of Alliance's corporate opportunities for interfering with certain Alliance clients in the amount of $16,465; and

    ix.    Punitive damages pursuant to NRS 42.005 in the amount of $40,000.

123.    On Alliance's Claim for Relief for Misappropriation of Trade Secrets under NRS 600A.010 et seq., against Crawford, Alliance was awarded damages of $1,607,084 plus punitive damages of $3,214,168 as follows:

    i.      Crawford's head start damages of $1,412,929;

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

51493473.3

i.   The value of the Alliance's documents taken by Crawford that qualify as trade secret documents under NRS 600A.030(5) in the amount of $194,155, (which was also awarded under Alliance's First Claim for Relief;) and

ii.   Punitive damages pursuant to NRS 600A.050(2) in the amount $3,214,168.

124.   As to Alliance's Claim for Relief for Conversion against Crawford, Alliance was awarded $264,019.21, which is made up of:

i.   The value of the Alliance's documents taken by Crawford in the amount of $233,510, (which was also awarded under Alliance's First Claim for Relief);

ii.   Crawford's improper use of Alliance's funds to pay Belle Business Services in the amount of $9,077.57, (which was also awarded under Alliance's Fourth Claim for Relief);

iii.   Crawford's improper use of Alliance's funds to pay Kalicki Collier LLP in the amount of $5,000, (which was also awarded under Alliance's Fourth Claim for Relief); and

iv.   Crawford's improper use of Alliance's funds to pay for his family's vacations and the use of Alliance's funds to purchase JetBlue airline tickets after June 4, 2018, in the amount of $16,431.64, (which was also awarded under Alliance's Fourth Claim for Relief).

125.   Crawford's actions at all relevant times were intended to benefit the marital community.

126.   Alliance's claims against the Debtors constitute a community property claim such that the marital community is liable on the claims.  See *Randono v. Turk*, 466 P.2d 218, 224, 86 Nev. 123, 132 (Nev. 1970) (community property is liable for debts of a spouse "whether arising out of tort or contract").

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

51493473.3

127.    Pursuant to 11 U.S.C. 524(a)(3), to the extent the Court enters judgment declaring Alliance's claims non-dischargeable, such a judgment shall apply to any discharge of the Debtors' marital community.

**First Cause of Action**

**11 U.S.C. §523(a)(4) – Larceny**

**Misappropriation of Trade Secrets – Alliance**

128.    Alliance incorporates the previous paragraphs of this Complaint as if fully set forth herein.

129.    Section 523(a)(4) exempts from the Debtors' discharge any debt that consists of larceny or embezzlement by the Debtor.

130.    According to Black's Law Dictionary (Sixth Edition), larceny can be defined as the actual or constructive taking away of property of another without the consent and against the will of the owner or possessor with the intent to convert the property to the use of someone other than the owner.

131.    By misappropriating Alliance's trade secrets, Crawford committed larceny, such that the Arbitrator's award is non-dischargeable.

132.    Generally, the "elements of a misappropriation of trade secrets claim include: (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose." *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000); *see also* NRS 600A.030(2)(a) (defining "misappropriation" to include "[a]cquisition of the trade secret of another by a person by improper means...."); *id*. (1)(d), (e) (defining improper means to include the willful "breach or willful inducement of a breach of a duty to maintain secrecy" or "duty imposed by...contract...").

133.    The determination of whether documents and information are trade secrets considers the following factors:

(1) the extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly acquired by others; (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee's knowledge of customer's buying habits and other customer data and whether this information is known by the employer's competitors.

*Frantz*, 999 P.2d at 358-59 (citation omitted). Client lists are generally classified as trade secrets. *Frantz*, 999 P.2d at 358.

134.   Trade secrets include information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain commercial or economic value for its disclosure or use and is subject to reasonable efforts to maintain secrecy." NRS 600A.030(5)(a).

135.   Based on the evidence provided at the arbitration hearing, the following documents taken by Crawford classify as trade secret information pursuant to NRS 600A.030(5):

a.      Alliance's entire profit and loss history;

b.      Excel spreadsheet with Alliance's referral source and client data;

c.      Alliance's referral source report containing a list of all Alliance's referral sources, the number of accounts referred, the specific accounts tied to the referral source, and the amount of revenue attributable to each;

d.      Alliance's 2019 Review and 2020 Strategic Marketing Plan;

e.      Alliance's draft tax return;

f.      Alliance's 2019 Internal Audit Report;

g.      A disclosure form provided to Alliance's clients;

h.      Alliance's Internal BSA Audit;

i.      Alliance's three budget spreadsheets and financial statements;

j.      Alliance's 2020 Second Quarter budget projections;

k.      2020 Nevada Financial Institutions Division Final Exam;

l.     Alliance's 2020 BSA/AML Policy;

m.    Alliance's 2020 Fee Review – Master List Updated. This spreadsheet contained all of Alliance's fees for all Alliance clients and discussed fee increase for certain clients;

n.    Alliance's Trust Fees Invoices;

o.    Alliance's 2020 Fee Review – Master List, which provides the specific fees charged to each Alliance client;

p.    "2020 Fee Review – Master List Updated," which contained all of Alliance's referral sources, revenues, and client information. (*A629, A630.*)

q.    Alliance's De-Risking Policy;

r.    Alliance's AML Risk Assessment report;

s.    The Salesforce reports that contained information regarding Alliance's clients and financial information with the following dates:

        i.    October 2, 2020;

        ii.    October 9, 2020;

        iii.    October 30, 2020;

        iv.    November 20, 2020;

        v.    November 27, 2020;

        vi.    December 18, 2020; and

        vii.    December 25, 2020.

t.    The CSV file that contained 34,060 rows of information regarding Alliance's clients, contacts, referral sources, and prospective clients and referral sources downloaded by Hoppe; and

u.    The documents related to the family that is an Alliance client.

(Collectively, the "Trade Secret Documents").

136.    Pursuant to the Operating Agreement, Crawford had a duty to maintain the secrecy of Alliance's Trade Secret Documents. Section 4.22.1(b) of Alliance's Operating Agreement provides that each member of Alliance will "hold the Confidential Information

1  in the strictest confidence for the sole benefit of [Alliance], and shall not, without the

2  written consent of [Alliance] use, disclose or permit any other Person to use or disclose,

3  directly or indirectly, of it in any manner whatsoever to any Person any Confidential

4  Information." Confidential Information includes, but is not limited to, "customer

5  information or lists, financial information, marketing information or plans, data, business

6  plans, referral source information, trade secrets, banking information or investments, ...

7  employment matters, wage, salary or benefit matters, and any customer, vendor or supplier

8  information...." Confidential Information under the Operating Agreement is a broader

9  definition than trade secrets as defined by Nevada law, and for that reason, the Trade Secret

10 Documents are subsumed within the Confidential Information pursuant to the Operating

11 Agreement. The Operating Agreement is a valid, binding, and enforceable contract, and

12 Crawford promised not to disclose Alliance's Trade Secret Documents or to use them for

13 any manner other than on behalf of Alliance's business.

14      137.    Crawford breached his duty to maintain the secrecy of Alliance's Trade

15 Secret Documents when he downloaded, sent, and used the Trade Secret Documents for a

16 purpose other than on behalf of Alliance. Starting at least in August 2020, Crawford and

17 others began downloading and emailing the Trade Secret Documents to themselves.

18 Crawford and the CTC managers then used portions of Alliance's Trade Secret Information

19 in setting up CTC. Alliance's Trade Secret Documents were used to create revenue

20 projections for CTC, which were used in applying to the FID, and using Alliance's clients

21 and referral source lists to target both for CTC's benefit. Several documents are titled

22 "Alliance – referral sources -through 2019", and then proceed to list the names of

23 Alliance's referral sources, how many trusts each Referral Source has referred to Alliance,

24 the total revenue from each referral sources, and the revenue per trust from the referral

25 source. Alliance's client and referral source financial information was used to create CTC's

26 financial projections.

27      138.    Crawford and others acting on his behalf downloaded and sent to themselves

28 Alliance's Trade Secret Information to get a jump on starting and operating CTC and to

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 32 -

51493473.3

allow him to target Alliance's clients and referral sources to bring to CTC when it became operational so CTC could quickly generate revenue.

139.    The documents listed above are trade secrets, as defined by NRS 600A.010(5), and Crawford had a duty to maintain those documents pursuant to Section 4.22.1 of the Operating Agreement. Crawford willfully breached his duty to maintain the secrecy of the Trade Secret Documents by acquiring and causing others to acquire the Trade Secret Documents by improper means so they could be used for CTC. Crawford thus misappropriated Alliance's Trade Secret Documents, and Alliance is entitled to damages.

140.    Crawford actually took Alliance's property in the form of the Trade Secret Documents without Alliance's consent and against its will.

141.    Crawford intended to and did convert the Trade Secret Documents to be used by CTC in its operations.

142.    Crawford therefore committed larceny with respect to the Trade Secret Documents and is therefore liable for $1,607.084, plus punitive damages as set forth below.

**Second Cause of Action**

**11 U.S.C. § 523(a)(4) – (Defalcation)**

**Breach of Fiduciary Duty – Alliance**

143.    Alliance incorporates the previous paragraphs of this Complaint as if fully set forth herein.

144.    Section 523(a)(4) exempts from Debtors' discharge any debt that constitutes defalcation while acting in a fiduciary capacity.

145.    Defalcation is the misappropriation of assets while acting in a fiduciary capacity.

146.    In Nevada, a "claim for breach of fiduciary duty customarily has three elements: (1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach." *Guzman v. Johnson*, 483 P.3d 531, 538 (Nev. 2021) (citation omitted). "[A] fiduciary relation exists between two persons when one of them is under a duty to act

for or to give advice for the benefit of another upon matters within the scope of the relation." *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009).

147.     Section 12.5 of the Operating Agreement binds the members to a duty of loyalty and good faith to Alliance, thus establishing a fiduciary duty that Crawford owed to Alliance which was for the benefit of Alliance in all matters.

148.     "The duty of loyalty requires the board and its directors to maintain, in good faith, the corporation's and its shareholders' best interest over anyone else's interest." *Kahn v. Dodds*, 252 P.3d 681, 700-01 (Nev. 2011) (quotation marks and citation omitted)).

149.     Between 2016 and 2018, Crawford improperly took his family on numerous trips with Alliance paying for his family's travel costs, including airfare and hotels. Crawford admitted he used Alliance's funds to take his wife and their two children on at least seven trips.

150.     Crawford spent $22,730.85 of Alliance's funds on personal trips for his family. None of these trips were approved by Alliance or any other members. Crawford refused to provide receipts for expenses he incurred on his Alliance debit card and Crawford failed to accurately report to other members specific charges, preventing other members of Alliance from discovering the extent of his misuse of Alliance's funds. He is liable for this amount.

151.     Crawford permitted his wife to use Alliance's debit card to purchase airfare for non-Alliance purposes in the amount of $9,397.31. These flights were purchased for Crawford's family, Lance McKenzie and his family, James Kalicki, and others for non-Alliance purposes. Therefore, Crawford is liable for $9,397.31 for his additional improper use of Alliance's funds for travel expenses.

152.     In addition, Crawford is liable for using Alliance's funds to pay Belle Business in the amount of $9,077.57 and to pay Kalicki Collier in the amount of $5,000, which were purely Crawford's personal expenses. Crawford was not permitted to use Alliance's funds for personal expenses.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

51493473.3

153.    Crawford is also liable for damages to Alliance in the amount of $352,785, for lost profits; $233,501 for the value of documents taken by Crawford; $338,330 for damages caused by his improper solicitation of an Alliance client or prospective client; and $16,465 for usurpation of corporate opportunities.

154.    Crawford had fiduciary duties to Alliance at the time he improperly used Alliance's funds for personal use.

155.    Crawford's use of the funds as set forth was improper and unauthorized.

156.    Crawford was aware and knew that the use of the funds for these personal purposes was wrong and not justifiable.

157.    Crawford, therefore, committed defalcation while acting in a fiduciary capacity and is liable for $987,295.73, plus punitive damages addressed below.

**Third Cause of Action**

**11 USC 523(a)(6)**

**Conversion – Alliance**

158.    Alliance incorporates the previous paragraphs of this Complaint as if fully set forth herein.

159.    Section 523(a)(6) exempts from Debtors' discharge any debt that constitutes willful and malicious injury to another or its property.

160.    The Nevada Supreme Court has explained that conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in the derogation, exclusion, or defiance of such title or rights." *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000) (quotation marks and citation omitted). Conversion requires a showing that the defendant exerted dominion over plaintiff's property and does not require a showing of "wrongful intent and is not excluded by care, good faith, or lack of knowledge." *Winchell v. Schiff*, 193 P.3d 946, 950 (Nev. 2008).

161.    Crawford is liable for conversion for wrongfully taking and exerting control in taking Alliance's Confidential Information.

162.     Crawford downloaded and took Alliance's Confidential Information without authority and in violation of the confidentiality provision of Section 4.22.1 of the Operating Agreement. Crawford did not have the authority to possess or use Alliance's Confidential Information for any purpose other than for Alliance, yet he took and used that Confidential Information for CTC.

163.     Alliance is the sole owner of the Confidential Information that Crawford took and used, and Alliance did not give Crawford authority to use its Confidential Information for non-Alliance purposes. Crawford's downloading and use of the Confidential Information was a distinct act of dominion inconsistent with Alliance's rights in the Confidential Information. Accordingly, Crawford is liable for conversion for taking Alliance's Confidential Information.

164.     The value of the Confidential Information taken by Crawford is $233,510.

165.     Crawford is liable for using Alliance's funds to pay Belle Business in the amount of $9,077.57 and Kalicki Collier in the amount of $5,000, which were purely Crawford's personal expenses. Crawford was not permitted to use Alliance's funds for personal expenses, which is what he did when paying Belle Business and Kalicki Collier.

166.     Crawford is liable for conversion for using Alliance's funds to pay for his family's vacations and allowing his wife to use Alliance's debit card to purchase flights for non-Alliance individuals in the amount of $16,431.64.

167.     Crawford wrongfully exerted dominion over Alliance's funds which was inconsistent with Alliance's rights, and he is therefore liable for conversion. Crawford is liable to Alliance for the $5,000 payment to Kalicki Collier; the $9,077.57 payment to Belle Business; the $16,431.64 in personal travel expenses after June 4, 2018; and $233,510 for converting Alliance's Confidential Information for a total amount of $264,019.21.

168.     Crawford's actions were willful in that his actions were intentional and intended to cause harm to Alliance.

169.    Crawford's actions were malicious as they constituted a wrongful, intentional act, without just cause or excuse, and with actual knowledge it would constitute harm to Alliance.

### Fourth Cause of Action

### 11 USC 523(a)(6)

### Punitive Damages – Alliance

170.    Alliance incorporates the previous paragraphs of this Complaint as if fully set forth herein.

171.    Section 523(a)(6) exempts from Debtor's discharge any debt that constitutes willful and malicious injury to another or its property.

172.    The Arbitrator awarded punitive damages against Crawford for his conduct vis-à-vis Alliance.

173.    In awarding punitive damages, the Arbitrator found that Crawford's conduct was willful, wanton, and reckless regarding the misappropriation of Alliance's trade secrets.

174.    Alliance was awarded $3,214,168 in punitive damages for the misappropriation of trade secrets.

175.    Alliance was awarded $40,000 in punitive damages for Crawford's breach of fiduciary duties owed to Alliance.

WHEREFORE, Alliance respectfully requests this Court enter judgment as follows:

A.    Declaring Crawford's misappropriation of trade secrets constituted larceny pursuant to 11 U.S.C. § 523(a)(4) and is non-dischargeable in the amount of $1,607,084;

B.    Declaring Crawford's misappropriation of Alliance's assets constituted defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. § 523(a)(4) and is non-dischargeable in the amount of $987,295.73;

C.      Declaring Crawford's conversion of Alliance's assets constituted a willful and malicious injury pursuant to 11 U.S.C. § 523(a)(6) and is non-dischargeable in the amount of $264,019.21;

D.      Declaring the punitive awards issued by the arbitrator against Crawford and in favor of Alliance constituted a willful and malicious injury pursuant 11 U.S.C. § 523(a)(6) and is non-dischargeable in the amount of $3,254,168;

E.      Awarding interest on any judgment entered by the Court at the highest statutory rate;

F.      Awarding costs of collection incurred by Alliance in the collection of any judgment entered by the Court;

G.      To the extent recoverable, attorneys' fees and costs incurred by Alliance in this matter; and

H.      Any such other and further relief as the Court may deem just and proper.

DATED this 12th day of May, 2025

FENNEMORE CRAIG, P.C.


By: _/s/ Anthony W. Austin_
Leslie Bryan Hart
Anthony W. Austin
Attorneys for Alliance Trust Company

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

- 38 -

51493473.3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that on May 12, 2025, a true and correct copy of the ***COMPLAINT TO DETERMINE DEBT NONDISCHARGEABLE,*** was transmitted electronically through the Court's e-filing electronic notice system to the parties associated with this case.

<u>     */s/  Gidget Kelsey*     </u>
An employee of Fennemore Craig, P.C.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW

51493473.3